I move on to the next argument on the calendar that's Chevron v. Donziger. Let me make sure that the parties and counsel are here. Mr. Donziger, are you here? I am, I am, your honor. Okay, you can see and hear me okay? Yes, I can. Good, and Mr. Hungar? Yes, your honor. Good, okay. So, Mr. Donziger, you have reserved two minutes of rebuttal, so you've got eight minutes now, and the floor is yours. Thank you so much, may it please the court, I'm Stephen Donziger. This case raises serious constitutional and human rights issues, the latter related to the ability of thousands of Ecuadorian citizens, who I've represented now for over 25 years, to enforce a judgment against Chevron that has been affirmed by three appellate courts in Ecuador and affirmed for enforcement purposes by the Supreme Court of Canada. The specific issue today is whether I, as the person who has raised 99% of the funds to support this litigation over all of these years by helping my clients sell some of their interests in the judgment, thereby providing a lifeline to communities literally on the brink of extinction because of oil pollution, whether I can be held in contempt based on my reasonable reliance of Judge Kaplan's RICO injunction issued in 2014 and explained by him in a clarification order in April of that year that allowed me, specifically authorized me, to raise funds and get paid, a retainer, to help the communities in Ecuador pursue their claims and try to enforce their judgment. As is their right, by the way, under decisions of this very court and the Supreme Courts of Ecuador and Canada. Judge Kaplan wrote, when explaining his injunction in 2014, these words. He said, as long as no collections are made in respect to the Lago Agrio judgment, that is the Ecuador judgment, and funneled to Donziger as retainer payments, the New York judgment, that is his RICO judgment, would not prevent Donziger from being paid just as he has been paid over the last nine or ten years. When I expressed concern that his March 4th injunction, that is the injunction he issued without the later explanation, would prevent me and my clients from continuing the litigation, even though he had ruled we were allowed to do so outside the United States, he called my concerns far-fetched, fanciful, and bordering on the irresponsible. So, based on that assurance from Judge Kaplan, I proceeded over the next four years to raise funds from investors and third-party litigation financiers in order to pursue or help my clients pursue enforcement in other jurisdictions, primarily Canada, where we had counsel in Canada. And I did exactly what he said I could do. In response to that, Judge Kaplan, five years later, issued a second injunction, which completely, and I would say radically, enlarged what he had ruled in – what he had issued in 2014 upon which this court relied in affirming his RICO judgment. And in that injunction, he prohibited me, without mentioning his clarification order, his explanation from April, from raising any money and being paid any money from third-party investors that we had been doing for several years in an effort to deliver some sort of justice to these long-suffering indigenous peoples in Ecuador. When Chevron came to Judge Kaplan in March of 2018 with a motion for contempt, there was zero evidence they presented that I had violated Judge Kaplan's RICO injunction. They asked Judge Kaplan to launch the most burdensome and intrusive discovery process affecting me, my wife, my family, investors, etc., that would intrude on attorney-client privilege and all sorts of significant constitutional concerns related to privilege and privacy. And I issued – excuse me, I'm sorry, was there a question? No. I filed a motion for a declaratory judgment before that process started, asking Judge Kaplan to rule as a matter of law that Chevron had no right to that discovery process that would pretty much wipe out all of my privileges and put the lives of my clients in danger for various reasons. Judge Kaplan refused to rule. Instead, he authorized Chevron to engage in unfettered discovery that lasted months and months, and in the end of the day, I was trying to get up to this court for almost two years now because I wanted to argue, and I will argue right now and have argued in my papers, that what Judge Kaplan was really doing was what this court prohibited him from doing in the Naranjo decision. Which was issued – or the first part of which was issued almost nine years ago this week. Can I back up a little bit? Sure. I was following along and – with great interest as you were talking about what Judge Kaplan assured you in the stay – in the process of litigation of the stay argument. And so up to there, I thought the argument was that what you were held in contempt for doing did not violate the – or at least you had a reasonable belief it didn't violate the injunction because Judge Kaplan himself told you that, right? Now, then you said there was a second injunction that was issued, which may be something I missed or didn't appreciate the significance of. Is the evidence of your engaging in selling parts of the plaintiff's interests in the judgment in order to raise litigation funds – is that evidence about something that you did after the second injunction, or is it about what you did before that injunction was issued? It was about what I did before that injunction was issued. Okay. So I'm correct that your principal argument here is that as of the time that you engaged in those activities, you were engaged in something you reasonably believed were legitimate activities because of what you were told at the time of the stay. That's exactly – That's the principal argument. Okay. That's exactly correct. And when I say second injunction, what I mean is in May of 2000 – and losing the years here – in 2019, Judge Kaplan issued a finding that held me in contempt, prohibiting me from doing the very acts he had authorized me to do back in 2014 upon which this court relied. Okay. So I think I understand what you're saying here. And with respect, let me just say it's slightly confusing because if there were a second order and then you violated that, then we'd have a whole different kind of situation here. Exactly. What you're really saying is the contempt finding was based on an interpretation that you maintain is contrary to the interpretation you were given at an earlier point in the litigation. That's what you mean by a second injunction. That's precisely correct. Okay. And if I could just add this one point real quickly because I know I'm running out of time, but I was in court, Judge Lynch, when you were on the panel in Naranjo in 2011. And this precise issue arose, which is what is the authority of a trial judge, in this case, Judge Kaplan, to try to play global police officer and dictate to courts around the world – We have different legal issues. The legal issue in Naranjo had to do with the effect of a particular New York statute. The legal issue here has to do with the effect of a specific injunction and what that injunction meant and how you could interpret it. These are different things. That's correct. I don't mean to get too far afield, but I only say that because the effect of Judge Kaplan going back, in my view, on his word, the words he himself stated in his injunction in 2014, I believe runs afoul of the Naranjo decision and also really violates the rule on mandated the case in the sense that this court – You've been held in contempt, and it seems to me that the strongest argument you have and the one that is most relevant to a finding of contempt is that the order either was not clear enough from the beginning or was represented to you by the very person who issued it in a way that meant that you had a reasonable belief that you could go forward. If we agree with you on that, we don't necessarily need, at least for purposes of that finding of contempt, to make some grand interpretation that it would have been illegitimate even if he had clearly enjoined the behavior that you were engaging in. You don't have to take on that burden, and that may not even help you because even Martin Luther King had to sit in jail because he violated an injunction that was in fact an unlawful injunction. So let's – okay, I got it. I agree, and I'm probably taking on too much when I brought that up. But I agree with your definition of the issue here. That is the main issue. I abided by his words. I heard his words. I acted in accordance with his words or what I thought was my reasonable belief in acting in accordance with his words. And I don't think it's – I think it's unlawful for him later to find me in contempt based on a different definition and then apply it retroactively. I have not violated – there's no allegation I violated his later enlargement of the 2014 order, his injunction, as explained by him in the April 25th order. So I do think that is the precise issue. Okay. All right. Well, why don't we stop there? We'll now hear from your adversary for 10 minutes. And you've reserved two minutes for rebuttal, Mr. Donhiggert. So now we'll hear from Mr. Hungar. Thank you, Your Honor, and may it please the court. I'd like to begin by clarifying what is and is not at issue in these consolidated appeals. There are only two appealable orders before the court. One has to do with the costs award amount, which has not been addressed this afternoon. And the second has to do with the district court's order holding Mr. Donhiggert in contempt of the RICO injunction for one specific item of conduct, namely retaining and personally profiting from $660,000 in funds attributable to and traceable to the fraudulent Ecuadorian judgment. Mr. Donhiggert has also addressed questions about his activities in monetizing the judgment and selling interests in the judgment to investors. But he was not held in contempt for that conduct. So that conduct is not before the court. The court did also find Mr. Donhiggert in contempt on other grounds, including his violations of the forensic inspection protocol and the CPLR 5222 restraining notice, as well as his transfer of a portion of his interest in the judgment to his life coach. But again, those interests, those issues are not before the court because Mr. Donhiggert did not appeal from those findings of contempt. So his principal argument is that it was perfectly fine for him to benefit from funds traceable to the fraudulent judgment and use those funds to pay for his personal expenses, gym memberships, wine bar, wine bills, and the like, because he says the RICO injunction did not clearly prohibit that conduct. That argument is clearly meritless. As the district court found, the injunction is clear and unambiguous. Paragraph one imposes a constructive trust on, quote, all property traceable to the judgment, close quote. And paragraph five prohibits, quote, any act to profit from the judgment. Well, Mr. Hunger, if we were here with nothing more than the text of the injunction, I would be inclined to agree with you that it's at least a very reasonable interpretation of the injunction. And maybe the only reasonable one that these that funds that are raised by selling a portion of the injunction is traceable of the judgment are traceable to the judgment. But we're not left just there. We're left with a situation with which Mr. Donziger sought a stay of the order, essentially by saying this keeps me from doing what I've been doing for years to try to finance the ongoing litigation. And he made that point to the judge with respect to a stay. And the judge said almost in so many words, no, you're wrong. It doesn't. And then went on to give particular assurances on page. Let's let's start with pages 12 to 13 of the special appendix. The the judge says. Let me just get it up here. It's a little tricky doing this on Zoom. The judge says nothing in the New York judgment. That's the RICO injunction prevents Donziger from continuing to work on the case, period. Then a little below on page 13. Thus, at least as long as no collections are made in response to the Lago Agrio judgment and funneled to Donziger as retainer payments. The New York judgment would not prevent him from being paid just as he has been paid at least almost a million dollars in the past nine or 10 years. The New York judgment would change things in respect of the payment of any contingent fee to Donziger as any such payment would be traceable to the judgment and thus subject to paragraph one. Now, it's a little hard for me to understand that language as saying anything other than as giving an interpretation, the judge's own interpretation of what traceable means. And maybe that's not what I would have thought looking at the word traceable in the first instance. But that sounds like what he's doing is saying, if you sell part of your contingent fee, that's traceable. But and so long as no money is made by actual enforcement of the judgment and funneled to you under the pretense that as part of a retainer agreement, that would be just like a contingent fee. And that's no good. But otherwise, you know, go in peace. So what am I missing about that interpretation? Well, several things, Your Honor. First of all, at the time the judge entered the state order, the appeal, the notices of appeal had already been filed. So the judge could not and did not modify the scope of the injunction. I didn't say I did. I made no suggestion whatsoever that he changed the substantive scope of the injunction. The issue here has to do with whether the rules under which he was operating were made clear to Mr. Donziger. And so the question is, why couldn't he rely on this as the judge's interpretation of the original language? Maybe it's a bad interpretation. Maybe it's a wrong interpretation. Maybe if that's what the judge meant in the first place, but he said something different, he no longer has the authority to change what the language is. But that's got none of that has anything to do with what's in Mr. Donziger's mind. Well, Your Honor, there's no mens rea requirement for a civil contempt charge. But the point is simply the operative order here is the injunction. The injunction is perfectly clear. The state order could not change the injunction, nor did it purport to. The language that you cite read in context simply does not support Mr. Donziger's interpretation, particularly when you read the state order as a whole. Wait, wait, wait, wait, wait, wait. But what he says to the what he says to the judge is this is a terrible injunction. You should stay it. I'm going to get it reversed. It should be stayed, which is something the judge has the authority to do. You should do that because it has these consequences. And the judge says to him, no, it does not. And now the question is, he's supposed to read, go back and read the original thing. And so I was right the first time it really does. And therefore, I have to abide by that and not by what the judge told me he meant. But, Your Honor, what's important here is what is the no, it does not. The judge never said in his state order that Mr. Donziger could profit from the injunction. I mean, I'm sorry, from the fraudulent judgment by obtaining proceeds of the sale of shares in that judgment and pocketing them. The judge never said that. To the contrary, he said precisely the opposite again and again and again in the state order. On page eight, on page 16 and 17 and page 37, multiple places in the in the state order that we've cited in our briefs. The judge says again and again, the injunction prohibits Mr. Donziger from profiting from the judgment, from profiting from his wrong, from profiting and benefiting from the fraudulent judgment. So you simply can't possibly interpret the words that Mr. Donziger relies on to say the opposite of what the judge said. It sure sounds like he's saying the opposite, or at least that he's saying that's not what I mean by profiting from. No, Your Honor. Because he says so long as you don't get any collections on the judgment, so long as it's not a contingent fee. The judge said in the same paragraph that you're referring to, the judge said as long as he's not paid from funds traceable to the judgment. So the judge wasn't changing his prohibitions from the injunction when he said that Mr. Donziger could be paid. He was simply saying there are two different ways money could be collected. One is they could be collected in a way that's traceable to the judgment and that money cannot be used to pay Mr. Donziger. But another is they could be collected in ways that aren't traceable to the judgment and money collected in ways not traceable to the judgment can be used to pay Mr. Donziger. I would note Mr. Donziger claims in his opening brief in the appeal in this case that the injunction, I'm sorry, that the litigation has been funded by donors as well as by investors. And so he could certainly continue to be paid by money obtained from donors, but he could not be paid by money obtained from investments in the judgment because that would be traceable to the judgment. And the judge said on the very page that your honor cited, S.P.A. 13, he couldn't be paid a retainer agreement from funds traceable to the judgment. So there's no inconsistency. And again, you can't possibly reach Mr. Donziger's conclusion that he can take hundreds of thousands of dollars that he admits are traceable to investment proceeds in the judgment and spend them on his personal expenses. You can't possibly reach that conclusion consistently with statements in the judge's state order. I'm not even talking about the injunction where he says, for instance, the New York judgment, including paragraph five, in fact, would deprive Donziger of the ability to profit from the Lago Agrio judgment that he obtained by fraud. And it would prevent him from benefiting personally from property traceable to that fraudulent judgment. That's at 16 and 17. There's no way to read those expressions of intent by the judge in the state order consistently with Mr. Donziger's position here, which is that he's fully entitled to profit from the fraudulent judgment as long as he hasn't actually succeeded in obtaining enforcement of the judgment. What about a page 18 where the judge says nothing in the New York judgment prevents the LAPs and their allies from continuing to raise money in the same fashion? That's a perfect example, Your Honor, because as you know, the parenthetical that you didn't read, it says nothing in the New York judgment prevents the LAPs other than the two LAP representatives who are named in the New York judgment and their allies from continuing to raise money. So the point the judge was making there is the same one I just made, that the two LAP representatives, like Mr. Donziger, are bound by the injunction. But the other LAPs, the non-appearing LAPs, were not bound by the judgment at the time it was entered. So they were free to continue raising money in ways that the injunction prohibited Mr. Donziger and the LAP representatives. And if they did so, could they pay any of that money to Mr. Donziger? No, because then the money going to him would violate the injunction because it was traceable to the injunction. But they could and did pay other lawyers. I mean, Mr. Donziger acts like the case couldn't go forward unless he was personally handling it. But that's simply false. Indeed, as far as I'm aware, he's never appeared in any court on behalf of as an attorney for the Lago Agrio plaintiffs. They've hired outside counsel, as they did in Canada and other jurisdictions where they unsuccessfully tried to enforce the judgment. And at the time this injunction was entered, the non-appearing LAPs could have sold interest in the judgment and use that money to fund other lawyers to litigate their case. And that's the point that Judge Kaplan was making here. But the point is, Mr. Donziger clearly unequivocally, unambiguously could not benefit from, could not profit from the fraudulent judgment. And that's not surprising because, after all, this judgment is entered because of Mr. Donziger's egregious fraud, racketeering, extortion, bribery. Incredible misconduct, including fraud on the courts in the United States as well as in Ecuador, is not surprising. And indeed, it's entirely to be expected, as this court said in affirming that judgment, that Mr. Donziger cannot profit from his fraud. That's the point of the injunction. And yet that's exactly what he has done in blatant violation of the injunction. All right. Well, let's stop there. Thank you, Mr. Hunger. We'll now hear from Mr. Donziger for two minutes of rebuttal. Thank you. Thank you, Your Honor. Just a couple of, Your Honors, just a couple of quick points. I mean, one is, as you know, I dispute that the judgment was fraudulent. I recognize Judge Kaplan found that it was. I've abided or I believe I've abided by his orders. Other courts have decided otherwise. This court has decided to affirm that very finding. So whatever happened in Canada or elsewhere, I mean, at worst, we are bound by that decision. Whether or not any individual. I absolutely acknowledge that. I'm getting to a couple of Mr. Hunger's points. You know, I wasn't raising money for myself. I was prohibited from raising money for my based on my interests and as well as the two other Ecuadorian individuals who appeared. What Judge Kaplan made clear that I could do was help my clients sell their shares so they could raise litigation monies to enforce their judgment outside of the United States, which is exactly what they were doing. Mr. Hunger's right. I have not appeared, however. But you have to do you have to establish one thing more. Right. Which is that the injunction on your reasonable interpretation, based on what Judge Kaplan said, entitled you to make money from that. It's not just that it's not just that you could raise money, help them raise money. You can help them raise money that they would pay to you is your contention. Exactly right. Pay litigation expenses, including paying to me because I played a central. I've worked on this case full time for a number of years and I help hire counsel in Canada. You know, this is a case in multiple countries with a broad institutional history. And I would argue that I'm vital and my clients certainly believe so to sort of helping things keep running, even though I do not appear in court. And, you know, the money I that my clients paid me on a retainer as authorized by Judge Kaplan since the 2014 RICO judgment are not huge sums of money. And a lot of that money went right back out to pay case expenses because many times we were out of money. You know, so this has been a tough, tough road for my clients who are suffering in Ecuador. And while I know that's not the precise issue before the court today, I would urge you to keep it in mind, because if Chevron has its way in a judge Kaplan's, you know, interpretation today of what he did in 2014 prevails. I truly believe I will and other lawyers as well will be unable to continue valid legal efforts as as validated by this very court and its affirmance of Judge Kaplan to try to enforce the judgment outside of the United States, where, by the way, progress has been made in other countries, including in Canada, where we want a unanimous Supreme Court decision in 2015. The precise distinction, just to respond to one final point of Mr. Hunger, is between whether monies or the profits, so to speak, are coming out of a collection on the judgment versus a sale of an interest permitted by Judge Kaplan of the lapse to fund enforcement of the judgment. That's the precise distinction he made. And I think Mr. Hunger and Chevron and his briefs are trying to conflate all that and ignore the explanation Judge Kaplan gave Judge Lynch, as you point out, in its April 25th, you know, stay clarification order. As a matter of fact, when Chevron came in trying to hold me in contempt in their first papers, they didn't even mention that. Just like today, Mr. Hunger argued, you know, just based on the March 4th order while ignoring what Judge Kaplan, how Judge Kaplan interpreted it. It's very important, obviously, what he said on April 25th. I relied on that. I don't believe that's a basis to hold me in contempt. And I would ask the court to vacate Judge Kaplan's finding of me being held in contempt on that basis. One final point. He held me in contempt on a number of things post his contempt, you know, post his refusal to rule on my motions. And a lot of that came out of a discovery process that never would have happened, in my view, had Judge Kaplan adhered to his original 2014 RICO injunction. So I'm asking the court to put me back in a position consistent with the 2014 injunction, erase all the contempts and all the, frankly, ruinous financial penalties that come from that. And basically put me back in the status quo ante, where I can continue to engage in these activities that this court relied on in affirming his judgment. Thank you, Mr. Dunziger. Thank you both. We will reserve decision.